Filed 2/4/21  P. v. Zibray CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ERNESTO ZIBRAY,<br><br>Defendant and Appellant. | F079192<br><br>(Super. Ct. No. BF168687B)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Judith K. Dulcich, Judge.

William G. Holzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric Christoffersen and Edrina Nazaradeh, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]        Before Franson, Acting P.J., Meehan, J. and DeSantos, J.

Defendant Ernesto Zibray was convicted of nine drug and firearm offenses. He contends on appeal that the search that led to the discovery of the drugs and firearms was unlawful because it was unreasonable in duration. The People disagree. We affirm.

## PROCEDURAL SUMMARY

On November 27, 2017,[1] the Kern County District Attorney filed an information charging defendant[2] with possession of cocaine for sale (Health & Saf. Code, § 11351; count 1), possession of heroin for sale (Health & Saf. Code, § 11351; count 2), possession of methamphetamine for sale (Health & Saf. Code, § 11378; count 3), possession of cocaine while armed with a firearm (Health & Saf. Code, § 11370.1; count 4), unlawful possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1);[3] counts 6 through 9), possession of cocaine (Health & Saf. Code, § 11350; count 11), and possession of a gaff (§ 597i; count 12).

As to counts 1 through 3, the information further alleged drug quantity enhancements (§§ 1203.07, subd. (a)(1), 1203.073, subd. (b)(1)) and alleged defendant was personally armed with a firearm (§ 12022, subd. (c)).

On December 11, defendant moved, pursuant to section 1538.5, to suppress the evidence obtained when he was detained and searched on the date of his arrest. On January 19, 2018, the trial court denied defendant's motion to suppress. On July 23, 2018, defendant renewed the motion to suppress based on *People v. Gutierrez* (2018) 21 Cal.App.5th 1146 (*Gutierrez*). On September 18, 2018, the trial court denied the renewed motion to suppress.

---

[1]     All further dates refer to the year 2017 unless otherwise stated.

[2]     Two codefendants, Mario Quevedo and Jose Aguilar, were also charged in the same information. The charges alleged solely against the codefendants are not relevant to this appeal and are therefore omitted.

[3]     All further statutory references are to the Penal Code unless otherwise stated.

On March 1, 2019, defendant pled no contest to count 1 and admitted the related firearm enhancement pursuant to a plea agreement.  The plea agreement stipulated that the remaining counts would be dismissed and defendant would receive a six-year term of imprisonment as follows:  on count 1, two years (the low term), plus four years for the firearm enhancement.

On April 23, 2019, the trial court sentenced defendant to the stipulated sentence.  On the same date, defendant filed a notice of appeal.

## FACTUAL SUMMARY[4]

### Deputy Guerrero

On June 13, at around 4:12 p.m., Kern County Sheriff's Deputy Dizander Guerrero, along with at least 10 other deputies, executed a search warrant regarding methamphetamine sales on a section of a parcel of land in Kern County rented by Quevedo.  The ranch-style parcel contained a gated area that was divided into multiple sections with plywood and metal sheets but had no roof.  When Guerrero and other deputies arrived, they announced themselves, entered through the main gate from the public roadway, and then entered the gate to Quevedo's section of the parcel with their firearms drawn.  Guerrero explained that officers routinely find firearms during execution of narcotics sales search warrants, so they enter with guns drawn for officer safety.  When Guerrero entered, he saw defendant, Aguilar, Quevedo, and Richard Abrey.  Defendant was between 20 and 30 feet from both the entrance to Quevedo's section and the nearby office in Quevedo's section.  The deputies directed defendant, Aguilar, Quevedo, and Abrey to raise their hands, placed them in handcuffs, and moved them outside of Quevedo's section of the parcel.  The deputies then secured the parcel.  It took deputies between 10 and 15 minutes to secure the parcel.  After deputies secured the

---

[4]     The factual record pertains to the evidentiary hearing on defendant's first motion to suppress.

3.

parcel, Quevedo told Guerrero " '[w]hatever you're looking for, it's in there,' " and directed him to an office area in his section where deputies discovered supplies for maintaining roosters, a large amount of heroin, cocaine, and methamphetamine, scales, packaging material, plastic baggies, and firearms. The deputies found the drugs and firearms in the office about 20 to 30 minutes after entering the parcel.

Approximately 10 minutes after deputies discovered the drugs and firearms, Guerrero read defendant his *Miranda*[5] rights and defendant agreed to speak with him. Defendant admitted that a handgun found in the office belonged to him and the cocaine and heroin belonged to him. A deputy also searched defendant and recovered a plastic baggie containing cocaine in his front coin pocket. Deputies also searched defendant's car and Quevedo's but did not recover any evidence relevant to the charges against defendant. The entire search of the section of the parcel and the cars took approximately three hours.

Guerrero and other deputies conducted surveillance of four of Quevedo's properties for 45 days prior to obtaining the search warrant for the parcel. In that time, deputies never saw defendant.

### *Defendant*[6]

Defendant testified that six deputies came into the area Quevedo rented with guns drawn and told him to put his hands up. Defendant was handcuffed, patted down, and searched. At that time, the deputies did not find any drugs in his pockets. He was moved out of Quevedo's section of the parcel. A deputy searched defendant again. Again, the deputies did not find any drugs in his pockets. Defendant gave the deputy his name and driver's license number.

---

[5]    *Miranda v. Arizona* (1966) 384 U.S. 436.

[6]    The trial court ultimately struck defendant's testimony after he invoked his Fifth Amendment right against self-incrimination when asked about how many times he had been to the parcel.

About one- and one-half hours to two hours after the deputies arrived, the deputies brought defendant and the other three men back into Quevedo's section of the parcel. Guerrero had not spoken to defendant at that point. The deputies appeared to still be searching the parcel. Deputies spoke with Quevedo and Abrey multiple times before they spoke to defendant. Defendant estimated that from the time officers entered Quevedo's section to the time Guerrero spoke with him, at least one- and one-half to two hours had passed.

Before defendant was placed in a patrol vehicle, he was searched for a third time. Deputies discovered a small bag of cocaine in his coin pocket.

## DISCUSSION

Defendant argues the length of his detention prior to the existence of an articulable and individualized suspicion of his criminal activity was unjustified. He contends therefore that his statement and the evidence of the cocaine found in his pocket should have been excluded. We disagree.

> "In deciding whether relevant evidence must be suppressed, we look exclusively to the requirements of the United States Constitution. [Citation.] In reviewing a ruling on a suppression motion, we 'defer to the trial court's factual findings, express or implied, where supported by substantial evidence.' [Citation.] 'In determining whether, on the facts so found [and/or facts that are undisputed], the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' [Citations.] The prosecution always bears the burden of justifying, by a preponderance of the evidence, that a warrantless search or seizure falls within a recognized exception to the warrant requirement." (*Gutierrez*, *supra*, 21 Cal.App.5th at p. 1152.)

"The Fourth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, guarantees the right to be free of unreasonable searches and seizures." (*People v. Gallegos* (2002) 96 Cal.App.4th 612, 622.) Detentions are "seizures of an individual which are strictly limited in duration, scope and purpose, and which may be undertaken by the police 'if there is an articulable suspicion

that a person has committed or is about to commit a crime.' " (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784.) The police have detained an individual " 'if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " (*Michigan v. Chesternut* (1988) 486 U.S. 567, 573.) Those circumstances may include "physical restraint, threat of force, or assertion of authority." (*In re Tony C.* (1978) 21 Cal.3d 888, 895.)

If a detention itself is unlawful, its fruits—that is, evidence subsequently obtained from searches, as well as any statements made by the defendant in connection with those searches—must be suppressed. (*United States v. Crews* (1980) 445 U.S. 463, 470.)

The parties agree, as do we, that defendant's detention began when officers entered Quevedo's section of the parcel. The parties further agree that the evidence presented at the suppression hearing suggests that defendant was detained between 30 and 50 minutes before defendant told Guerrero that the handgun, cocaine, and heroin found in the office belonged to him.

Defendant contends that our opinion in *Gutierrez*, *supra*, 21 Cal.App.5th at pages 1152 to 1161 compels the conclusion that, based on the facts known to the deputies during defendant's detention, "he was at most a visitor to the property" who could not be detained for 30 to 50 minutes. The People correctly note that this case is differently situated than *Gutierrez*.

In *Gutierrez*, the defendant was detained during a routine probation compliance search of a third party's home. (*Gutierrez*, *supra*, 21 Cal.App.5th at p. 1149.) He was removed from the house, searched for weapons, and directed to sit on the front porch. (*Ibid*.) He was detained for "longer than 30 minutes but no more than 50 minutes" when officers were informed (incorrectly) that he was on postrelease community supervision. (*Id*. at pp. 1150, 1153.) Officers then performed a more complete search of his person and searched his nearby vehicle. The searches yielded cash, methamphetamine, a digital scale, and ammunition. (*Id*. at p. 1150, fns. 4 & 5.)

6.

In *Gutierrez*, we balanced the governmental interests in the search (or lack thereof) against the extent of the intrusion and considered whether the detention was supported by an articulable and individualized suspicion of the defendant's criminal conduct. (*Gutierrez*, *supra*, 21 Cal.App.5th at p. 1159.) We distinguished *Gutierrez* from situations where the defendants were detained (1) during third party probation searches conducted based on drug-use-related violations of probation (*People v. Matelski* (2000) 82 Cal.App.4th 837, 841 [the search was "prompted" by the fact that probationer had failed a drug test]; *People v. Rios* (2011) 193 Cal.App.4th 584, 589 [probationer had admitted to being under the influence of methamphetamine, and drug paraphernalia and gang tagging was found in house]), (2) during the execution of search warrants (*Michigan v. Summers* (1981) 452 U.S. 692, 702–703; *People v. Glaser* (1995) 11 Cal.4th 354, 374–375), (3) where law enforcement had reason to believe the defendant was dangerous,[7] and (4) where law enforcement had reason to suspect that drug dealing was afoot. (*Gutierrez*, at pp. 1154, 1158–1161.) None of those governmental interests that weigh in favor of detention was present in *Gutierrez*. (*Id*. at p. 1161.) We also found that the detention was at least moderately intrusive because, while Gutierrez was not met at gunpoint, he was ordered out of the house, frisked in the front yard or porch, and ordered to remain for 30 to 50 minutes under guard by an officer. (*Id*. at p. 1159.) The public nature of the search and detention contributed to the intrusive nature of the search. (*Id*. at pp. 1154–1155, citing *Summers*, *supra*, 452 U.S. at p. 702.)

We also noted that law enforcement's purpose in detaining the defendant after the initial officer safety search was independent of the purpose of the third party probation search—an officer asked the dispatcher to determine whether the defendant was subject

---

[7] The need to detain a defendant "to protect … police officers is not as compelling [when there is no evidence of criminal activity] as when a search warrant has been issued or when a police officer has a reasonable basis to believe criminal activity is occurring." (*People v. Hannah* (1996) 51 Cal.App.4th 1335, 1345.)

to search terms. (*Gutierrez*, at pp. 1159–1160.) We considered that the defendant was detained without any articulable and individualized suspicion that he had committed any offense—a testifying officer "candidly admitted that the deputies did not suspect Gutierrez of any wrongdoing." (*Id*. at p. 1160.) We also considered that the defendant was not a known resident or " 'familiar visitor' " of a search location being searched for drugs "who would reasonably be expected to have access to firearms." (*Id*. at p. 1161.)

In light of the absence of governmental interests, the absence of a search warrant, the apparent independent purpose of the detention after the officer safety search, the moderately intrusive nature of the search, and the absence of any evidence suggesting the officers had reason to suspect that the defendant was dangerous or that any criminal activity of any kind was afoot, we concluded that the duration of the defendant's search was unjustified. (*Gutierrez*, *supra*, 21 Cal.App.5th at pp. 1158–1161.) Such is not the case here.

Here, defendant was initially detained for officer safety for 10 to 15 minutes as the officers secured the section of the parcel subject to the search warrant. Quevedo then directed the deputies to the office where they spent an additional five to 15 minutes searching for narcotics pursuant to a warrant. Within 30 minutes of entry to the section, deputies had discovered narcotics, indicia of narcotics sales, firearms, and implements for rooster fighting, all about 20 to 30 feet from where defendant stood when deputies entered the section. Defendant was then detained on suspicion of involvement in narcotic sales, incident to execution of a search warrant regarding narcotics sales at Quevedo's section of the parcel. Unlike *Gutierrez*, defendant was not detained as a third party to a routine probation search where no crime was suspected. Crimes were committed, and defendant was within 30 feet of the evidence of the crimes. The deputies were justified in detaining defendant for the period of time required to protect the deputies and to determine defendant's relationship to the property. (*People v. Glaser*, *supra*, 11 Cal.4th at p. 374; *People v. Hannah*, *supra*, 51 Cal.App.4th at p. 1345.) By Guerrero's estimate,

8.

defendant was *Mirandized* and questioned within 10 minutes of the deputies' discovery of the narcotics. In the time between the discovery of the narcotics and firearms and Guerrero's interview of defendant, Guerrero spoke to Quevedo and perhaps Abrey regarding their connections to the property. Deputies did not prolong defendant's detention for a purpose unrelated to the warranted search. They systematically interviewed the occupants of the section regarding their connection to it. While the detention was more intrusive than *Gutierrez*—here, officers entered with drawn weapons, in addition to handcuffing the occupants of Quevedo's section of the parcel and detaining them in a relatively public area—we cannot say the duration or manner of the detention was unreasonable under the Fourth Amendment.[8]

## DISPOSITION

The judgment is affirmed.

---

[8] Defendant's emphasis that deputies had no indication that he was anything more than a visitor is misplaced. He was not detained in a residence. None of the inhabitants of Quevedo's section of the parcel were residents. What mattered was defendant's purpose at and relationship to the property. As discussed, the officers did not unreasonably delay in making that determination.